I'll call the next case, Cisneros v. Petland, Inc., et al. Good morning. May it please the Court, good morning. My name is Kelsey Eberle. I'm here on behalf of Plaintiff Appellant Rosalba Cisneros. In this case, a pet store franchise, its franchisees, and a customer service company are using the cover of their legitimate businesses to collude with a network of veterinarians in order to rubber stamp as healthy, sick, and disease-prone puppies in order to illicitly charge a premium for the pets and for accompanying services. Mrs. Cisneros' complaint alleging this scheme is based not only on her own tragic experience in the investigation of her counsel, but on the sworn affidavit of the former preferred veterinarian of Defendant Petland Kennesaw who described the scheme in detail and quit that position when he would not go along with it. So is that affidavit in the record? The affidavit was attached to Defendant Petland Kennesaw's motion to dismiss, and we cite several excerpts of the affidavit in our complaint, yes. You mentioned the preferred veterinarians. Why were none of the preferred veterinarians included as defendants? Mrs. Cisneros is holding these defendants accountable, Petland Kennesaw and Positive, for conducting the affairs of an association, in fact, enterprise. There's certainly no requirement that all of the members of an enterprise be named as defendants, and certainly this case would be more unworkable if she had named, you know, every single veterinarian in all of the clinics and all of the members of the enterprise. So she is holding these defendants accountable for conducting the affairs of the enterprise using the veterinarians, but this case doesn't require the participation of the veterinarian as a defendant. So what is the basis for your client's belief that the franchisor recruited a nationwide network of veterinarians, as opposed to Petland Kennesaw having hired this local vet 13 years ago and the vet who's named in the case? Yes, so I think this is a really critical, you know, set of facts, because the lower court really misread our allegations on this point. So what Dr. Good testified to when he was the preferred veterinarian for defendant Petland Kennesaw 10 years ago, or for a period of 10 years ending in 2005, was that at the same time that he was becoming increasingly concerned with the puppy mill pets coming off the tracks, with the majority of the animals being sick, with Petland nevertheless seeking to sell them. Petland or Petland Kennesaw? Petland Kennesaw at the direction of Petland going under Petland's corporate protocols. So what, if I can just finish, what Petland Kennesaw, what Dr. Good testified to was that at the same time that this was happening, that Petland Kennesaw's management was becoming closer and closer with Petland corporate, and that when he repeatedly states in his affidavit that when he had suggestions and wanted to do things differently and wanted to treat the sick pets differently, he was told again and again that Petland corporate had its own protocols for the treatment and sale of sick animals, and that the store was going to follow those protocols. So when the complaint talks about the franchise agreement and— Okay, so let me ask again. Sure. Other than that vet who was, whose direct relationship was with Petland Kennesaw, and the current, the vet named in the complaint, what facts do you have, or were you relying on when you drafted this complaint that the Petland franchisor recruited veterinarians nationwide to participate in the scheme that you're describing? Yes, Your Honor. I want to be clear that it's not necessary for our scheme that Petland corporate itself recruited the veterinarians. It instructed its franchises to recruit veterinarians who would be willing to rubber stamp these health certificates and to— And you infer that from the experience from one franchisee, Petland Kennesaw. No, Your Honor. From the fact that Petland Kennesaw is not just any franchise. It is a core franchise of Petland that is used as a training ground. So one of the facts in our complaint was that Petland uses Petland Kennesaw to train other Petland franchises. So that, you know, leads us to believe that what happens at Petland Kennesaw is not unique or some sort of fluke or a franchise going rogue, but a franchise that follows Petland corporate's protocols. Petland also exerts strict control over its franchises through the cover of its franchise agreement. And one of the ways it inflicts control is by mandating that pet stores, you know, work with veterinarians. It has a specific protocol for the sale of pets. And so to take what happened to Mrs. Narrows years after Dr. Goode had testified about this scheme, to take that as some sort of accident or a fluke or Dr. Waller going rogue, is to ignore all the facts in the complaint that show that Petland Kennesaw is one of Petland's chief franchises. So your position is that all the franchisees have been corrupted by the franchisor? Discovery may show that certain franchises are going along with the scheme more than others. The question on a motion to dismiss, this case was dismissed on a motion to dismiss, is was Petland, did Petland use the cover of its legitimate business, its franchise business, to mandate an arrangement for the sale of pets? Right, but you're proceeding under civil reco. Yes. Among other things, you assert an association in fact as the enterprise itself. That's right. And you assert that the association in fact is made up, one, of Petland, two, its franchisees, three, P.A.W. Sittive, and four, preferred veterinarians. And you say they constitute an association in fact enterprise, right? That's correct. In order to establish, in order to plausibly say enough in a complaint to establish an association in fact enterprise, you've got to assert, among other things, a common purpose, a relationship among those associated with the enterprise, and a longevity sufficient to permit the associates to pursue the employee's purpose. You say, as I read the complaint, at a high order of abstraction, that the common purpose was to, quote, implement Poland's scheme to defraud customers into purchasing animals with sham health certifications and illusory services. Standing alone, that would not be enough to establish a common purpose. Just speaking for myself, you're going to have to allege a whole bunch more than that because that would run afoul of the requirement that you plead something in a manner that's not simply conclusory or at a very high order of abstraction. But that's the common purpose that you assert. So then when I looked in the complaint itself to see what factual allegations you make in support of the existence of this common fraudulent purpose, I could see only seven that even remotely would get you there. And I want to go through them with you to tell me how drawing all of these inferences in a light most favorable to you, that would be enough to meet the pleading requirements for a common purpose which it seems to me is most critical here for pleading enough to show an association in fact. The first thing I find at seven and eight, you say, Poland tightly controlled its franchises with uniform policies and procedures. But there's nothing about that that suggests even remotely the common purpose was to defraud all of the purchasers, right? No, Your Honor. Do you think I could infer a purpose to defraud from the fact that the franchisor maintains uniform policies and procedures for all of its franchisees? No, Your Honor. The allegation about the franchise agreement is to show that Petland has the means to control its enterprise. The fact that really is that the key of the common purpose of illicitly charging premiums for sick and disease-prone pets and literally using a rubber stamp to tell customers that these pets are healthy. Let me just run through. I'm just running through the complaint. That in and of itself doesn't answer the question. The second thing you assert at 11, I'm looking at the complaint itself. Paw Sativ has an apparently nearly exclusive relationship with Petland that is not disclosed to consumers that it states on its website the purpose is to help pet stores increase their profitability and fix holes in the management of pet stores. How does that specifically show a common purpose to commit this fraud? Standing alone, what inference, if any, can I draw from that? The fact that Paw Sativ is so economically interdependent on Petland is one of the factors that other courts have used in finding an association, in fact, enterprise. So when a business is so dependent on another and is essentially serving another, that can be one factor that answers the question. I'm just looking at that. Then the third one you cite is upon information, belief Petland pays preferred veterinarians a fixed rate each month in exchange for their agreement to certify. How does that show a common purpose to commit fraud? It doesn't jump out at me. Because both Petland and the veterinarians know the health status of these animals. They know that the majority of these animals No, I'm just talking about paying the preferred veterinarians a fixed rate would hardly establish a common purpose to commit fraud, would it? So, again, it demonstrates that Petland has a relationship with the veterinarians. That fact alone might show that they have the capacity to do it, perhaps, but it doesn't in and of itself suggest fraud, does it? Standing alone, perhaps not. But viewed with all of the other allegations in the complaint, the fact that both Petland and the veterinarians know that the animals are sick and nevertheless try to get them out the door and into customers' homes within this incubation period before diseases become symptomatic and that Dr. Goode testified that he specifically told Petland Kennesaw about this symptomatic period and that he observed that this was their strategy and that they would later blame the customers for animals getting sick and that customers, after being given the certificate saying their pet is healthy, are then directed back to those same veterinarians who are, of course, not going to say, Oh, actually, this piece of paper that I gave you was wrong. And the other thing you cite is the circumstantial evidence flowing from the fact that Pau Sativ called Cisneros and stated the dog was improving while it may well have been. This is the way you phrase it. Dead suggests a purpose to further the fraud. Then you say you reference the testimony of Dr. Goode regarding the influence Petland Kennesaw management had over the veterinarians. And you say Dr. Waller called and brought over a Petland Kennesaw manager when Cisneros went to pick up the dog's body. And then you cite, quote, the economic irrationality of the behavior of preferred vets, that that's somehow indicative of a different or larger purpose. I was just looking for the common purpose to commit this fraud. Is there anything else in the complaint that bears directly and specifically on common purpose other than the seven allegations that I read from the complaint that I should consider to ask whether you've pled enough for an association, in fact, to have the common purpose to implement a scheme to defraud customers? Yes, Your Honor, I believe the Dr. Goode affidavit alone is very strong evidence. Combined with the fact that Mrs. Cisneros experienced the very harm that Dr. Goode predicted would happen 10 years later in the exact same way. So if you're looking to the complaint, paragraphs 48 and 50 describe the certification process and how it's essentially a tool to get customers to spend $2,400 on an animal that is actually dying. That's the core of the scheme, the fact that the defendants knew the health status of these animals. So I see that I'm over my time. No, you were answering my question. Thank you. Thank you very much. Thank you. I see that the police have broken their argument into three separate arguments, one by Petland, one by Pets BKG, and one by Porcetieve, right? That's correct, Your Honor. Good morning. Welcome. Fire away. Good morning, Your Honors. May it please the Court. My name is Michael Greshin, and with me this morning is Mr. Hank Fellows, and together we represent Petland, Inc., who is the Ohio-based national franchisor of the Petland family of stores. To follow a few questions that the panel has posed to opposing counsel, Judge Ungaro asked, what factual basis do you have to say that the national franchisor recruited a nationwide enterprise of veterinarians? The fact is there were no facts that were alleged. The affidavit of Dr. Goode discusses how he left Petland, Kennesaw more than 10 years ago and mentions nothing about Petland corporate's protocols, procedures, or anything. So the affidavit does nothing to show that Petland, Inc. did anything more than act as a national franchisor here. And then as Judge Marcus was going through the facts to allege a common purpose, I think opposing counsel's answers stand for themselves. Those allegations do not show a common purpose to defraud. They show individual defendants, in these cases the franchisor. It seems to me the strongest allegation they've got references the testimony of Goode, a former preferred vet, regarding the influence that management had over the preferred vet's care decisions. What about the Goode testimony taking it in a light most favorable to the non-moving party here? Two responses to that, Judge Marcus. First is, again, Dr. Goode mentioned that he has not been with Petland, Kennesaw for 10 years, since 2005. And so to infer something about protocols that are existing 10 years later just is not plausible. And second, if we look through that affidavit, Petland corporate is a phrase that appears I think three times in the affidavit, but nowhere does the affidavit allege what Petland's protocols were, Petland corporate's protocols were, what the procedures were, or even what this direction that Petland Inc. was supposed to have given the Petland franchise is. So the affidavit gets you nowhere in terms of establishing a common purpose and in terms of establishing certainly a RICO enterprise. If you look at the district court's order, the district court's order correctly analyzed this under the participation and management elements that the U.S. Supreme Court has laid forth in Reeves. And I think if you isolate the, if you disregard rather, the conclusory allegations in the complaint, you're left with individual corporations in a franchise system pursuing their own interests and not relying on some sort of economic, unusual economic interdependence that the cases finding RICO enterprises find in those circumstances. For instance, the Bible case that's cited by the appellant, or the George v. Urban Settlement Services case. Those cases relied on an unusual amount of economic interdependence between the participants in the alleged RICO enterprise. And that's just not what we have here when you set aside the conclusory allegations in the complaint. So the district court's order was correct on that front, that what you're left with is a single sale of a single pet at one location. And the appellant wants to take that and conclude that this must result from a nationwide scheme to defraud. But the plaintiff has not pled any facts that gets her there, and that's why the district court was correct in dismissing the federal claims, and it's another reason why the court should affirm the district court below. Of course, she could theoretically be entitled to establish an association, in fact, with a common purpose, sufficient longevity, et cetera, even if she couldn't otherwise establish a foundation for a class certification. We're not here on a class question. We're simply here on asking whether she said enough and pled enough to get in the door and be heard about whether there was an association, in fact, even with respect to these particular players and this particular incident. That's correct, Your Honor. And I think the way that the fact that she may not have said enough or pled enough to establish a commonality, numerosity, typicality, adequacy is not really before us, right? That's correct, Your Honor. The question is whether she's plausibly alleged violations of RICO under Georgia and federal law. And I think here, if you look at your decision in the Ray case, if you look at the conduct that's plausibly alleged and well pled as to each defendant, there's nothing odd about a franchisor requiring uniformity with its franchises. That doesn't get you a common purpose to defraud. It doesn't get you an enterprise. And I think that's why Judge Cohen's order in the district court was correct in saying that at bottom, what we have here is a single sale of a single pet. And the actions that are well pled against these defendants, and there's few of them, really only show that the defendants were acting as a normal franchise. But even if it was a single sale involving a single pet, theoretically there could be multiple acts of wire or mail fraud or both, and there could be an association, in fact, enterprise, with regard to that single sale. It might be hard to prove, but it doesn't say that she could not plead it. I believe it. Which brings me to sort of help me with this. She's got to say enough about the predicate acts of mail and wire fraud as well as showing a common purpose among the association, in fact. And so under 9b, she's got to plead with particularity the nature of the fraud and the circumstances. As I see it, the heart of her complaint on fraud turns on the following pleading. She says, or the complaint says, at the time of the purchase, a Petlin Kennesaw employee named Caitlin gave Cisneros a certificate of veterinarian inspection stating that Waller had certified the puppy as healthy, fit for adoption, and free of parvovirus. The fraud adheres, she says in that, that the certification was false. They well knew that. At the front end, they said that the puppy was healthy, fit for adoption, and free of this viral infection. If that isn't enough, then everything else fails. That's easy. But if that's enough, then we'd get to the other sort of predicate pieces that follow thereafter. You follow the thrust of my question. So my question to you is whether that is enough to plead with particularity. If the answer is not, tell me why not. It is not, Your Honor, because the claim is a RICO claim. It's not enough to plausibly allege one particular act of one veterinarian saying that he had checked this twice, checked the dog twice. To allege that that was false does not get you to a RICO claim. Because, I mean, even if you take that particular, and I see that my time has expired. That's all right. You're answering my question. Briefly respond, yes. If you look at those allegations in the complaint that are specific to the plaintiff herself, this is paragraphs, I believe, 29 through 37 of the complaint. Pet landing is mentioned nowhere in those allegations. And so what's left is, and the plaintiff herself admits this in the first page of her complaint, that all the allegations as to herself she can plead based off of her own experiences, but every other allegation in the complaint. In other words, every allegation about a RICO scheme is pled upon information and belief. And, of course, everything that Your Honor just mentioned as questions would be those allegations that do not. The complaint itself doesn't include any document called Certificate of Veterinarian Inspection, does it? It does not. But it provides a picture of a document dated December 9, 2015 called Puppy Kitten Veterinarian Health Exam, which appears to me to be what the plaintiff is talking about here. What about that? That's what she's referring to in terms of some kind of certification. That's correct, Your Honor. I believe, as my co-counsel for Petland Kennesaw and Positive well discussed in their briefs, that's not a certification that anything other than what's listed there that the veterinarian checked for certain things. It certainly is not anything more than what's listed there. And so for the plaintiff to allege that that certified more than what's there would be inappropriate. Well, but it does say, at the time of the examination I found this puppy to be free of any internal or external parasites. I find this puppy, quote, to be happy, healthy, and fit for adoption. And in fact, the puppy has or requires at some point soon thereafter this viral infection. And that's certainly what's alleged, Your Honor. That's what they allege. There are no facts that allege that Petland, Inc. was aware of any of that conduct by the veterinarian in filling out that form. And I think that's the problem with the plaintiff's complaint ultimately. Thank you. Thank you. Thank you. Good morning, and on behalf of Petland Kennesaw, may it please the Court. Judge Cohen correctly ruled that Kennesaw's suburban Atlanta store selling dogs, birds, and squeaky toys is not operating with criminal intent to direct a nationwide RICO enterprise. This Court should affirm that order for many reasons, but let me highlight three that track the Court's order and what we've been talking about this morning. One, there are no allegations that Kennesaw operated or managed an enterprise which is required by Reeves. There are no plausible or particular allegations to support the wild speculation that the complaint reflects. And there are no well-plaid predicate acts as to Kennesaw. Now, first on Reeves, and this goes both to the absence of a common purpose and the absence of managing an enterprise, Reeves requires well-plaid allegations that Kennesaw managed and directed an enterprise. Now, we supposedly did that from the bottom up, even though the allegations in the complaint allege a top-down conspiracy. But what do they rely on? They rely on training. Plaintiff says that Kennesaw served as a training grounds. But there is no allegation about the content of any training whatsoever, and only wild speculation would support that Kennesaw was training in fraud versus training in how to set up a pet store or how to sell more gerbils. What else do they rely on? A franchise agreement. Because the franchise agreement discusses a, quote, unique system in which Kennesaw is supposedly involved. That agreement is attached to the complaint. You can read it word for word. There's not a single sentence in there that describes or even hints at Kennesaw managing or directing a fraudulent scheme of any kind. It doesn't even mention Kennesaw. And, in fact, it says, Petland makes the health and well-being of our pets our highest priority. That's just like the contract in this court's Almanza decision about the Mexican tourism tax in an airline. And this court noted that that agreement, even though it's what the plaintiffs were relying on, quote, says nothing about an illicit enterprise or fraud scheme. And so the court can't make any inferences about the franchise agreement that are plausible, just like it couldn't in Almanza. Now let me talk about the Dr. Good affidavit. The Dr. Good affidavit is not probative of anything because Dr. Good stopped working for Kennesaw 14 years ago when George W. Bush was president and Apple had never sold an iPhone. Moreover, Dr. Good isn't saying anything about Kennesaw directing anyone to commit fraud or issue false health certifications. And Dr. Good certainly isn't admitting that when he was the preferred vet that he was doing that. There's nothing that says he was issuing false exams, that anyone told him at Kennesaw to do the same thing, and there's no evidence in there that that's going on today. To the contrary, the affidavit at docket 16-2, page 5, says that when he was the preferred vet, Dr. Good performed the health exams for the dogs. He provided the treatment that he thought was necessary. He then invoiced Kennesaw, and Kennesaw paid him. That's ordinary business operations. That says nothing about fraud. Now let me talk about particularity and plausibility. Judge Marcus, you said that you've got to plausibly put enough on the table to get the complaint over the finish line. Here, the complaint faces possibly the most stringent pleading requirements you could imagine, not only Twombly-Iqbal, but also 9b, heightened particularity under fraud, because the exclusive Predicate Act allegations are mail-and-wire fraud, and because, as Your Honor noted, the alleged common purpose is to commit fraud to make more money. Here, instead of pleading with particularity, the complaint does the opposite. Page 1 says every allegation in the complaint is pled upon information and belief, except as to the plaintiff's own acts. Furthermore, 10 more times in the complaint, when you get to the most critical allegations, they are alleged specifically upon information and belief, and those are detailed at page 22 of Kennesaw's brief. Now, the other point I want to say is that many of the implausible and conclusive allegations are contradicted by the documents. Look at paragraph 57. That's where the plaintiff alleges that Kennesaw, quote, requires customers to use a preferred bet and, quote, restricts customers from using an independent bet. That is absolutely false. When you look at docket 1-2, which is attached to the complaint, and it's the contract that the plaintiff signed, says, quote, we, meaning Kennesaw, understand that you may have a personal relationship with a different veterinarian, and because of this, Kennesaw will provide for up to 25% reimbursement. That's not requiring or restricting anything. By the way, if I could just interrupt you for a second. I did not see in the record what the outcome of this dispute was. Did Mrs. Cincineros get her money back for the puppy? Mrs. Cincineros tactically declined to allege what happened. In fact, she was offered her money back and refused to accept it so she could sue. The last point I want to make quickly. But there's no record evidence in the complaint or any attachment to that effect? No, Your Honor. Let me make one last point about predicate acts. As to Petlin-Kennesaw, there are zero, and here's why. The court should look very closely at paragraphs 97 through 101 where the predicate acts are alleged. Aside from paragraph 98 as to Kennesaw, all of the acts are alleged upon information and belief and without any specificity. Those fail. What about the allegation, at the time of the purchase of Petlin-Kennesaw, an employee named Caitlin gave Mrs. Cincineros a certificate of veterinarian inspection stating that Waller had certified the puppy as healthy, fit for adoption, and free of parvovirus. Your Honor, that's not mail or wire fraud. And that also says nothing. Well, that's not an act of mail. That wouldn't be an act of fraud, a mail or wire fraud. But you can have an underlying fraud that's executed or maximized by using the mails and wires. You can even have a mailing that in and of itself may be non-fraudulent, but to the extent that it is an integral part of and affects the scheme and ought of us to defraud, that would be enough. The actual mailing doesn't have to contain the fraud so long as it's an integral part of and effectively maximizes the scheme. So what about this allegation that Caitlin gave a false certificate claiming the dog was healthy and free of parvovirus when in truth and in fact they allege that wasn't the case? The dog was sick and indeed was suffering from the virus. A couple points, Your Honor. First of all, it's not a certification. It's the result of one health examination from someone who isn't Kenesaw. Right, so we don't have any certification in the complaint. We just have an assertion, and the only thing we actually have is what they call a puppy-kitten veterinarian health exam. That's right, because no one could certify that a pet or a baby or anyone will be healthy forever, guaranteed. That's why there's a warranty about the terms for when an animal is not healthy, what will happen, and what Petland Kenesaw will offer to pay. And so there's just no fraud that comes out of that. Also, it is just completely conclusively assumed that all these pets are sick and unhealthy and came from puppy mills. There's not a single allegation in the complaint naming any single place where any animal came from. It's all just conclusory. And the last point I wanted to make on the no predicate acts at paragraph 98, two are phone calls, which are not mail-or-wire fraud because Kenesaw is in Georgia and the plaintiff's in Georgia. The only other predicate act is charging the plaintiff's credit card for the purchase of the dog. One, that was just an ordinary transaction, which is not fraud at all. But two, that's only one predicate act. And so it's not true that in paragraph 99 when they say there are, quote, thousands of predicate acts, there are zero and at most one. This court should affirm. Thank you. Thank you. Morning. Good morning. Morning, Daniel Rogers from Shokardi and Bacon. On behalf of the Appellee Positive Solutions, I would definitely concur with counsel for my co-defendants regarding the lack of any plausible allegations of a civil RICO claim in this complaint. And I just wanted to spend a couple of minutes to particularly note how that's true with respect to my client, Positive. If you look at the allegations in the complaint with respect to Positive and their interactions with plaintiff, they are extremely limited, and they all occurred after the alleged injury here occurred. The only role of Positive here was to serve as a point of contact for any issues that arose. And so there was one call that occurred between the plaintiff and my client's representative on December 19th to provide the known status of the dog that was being cared for by the vet. And as part of that conversation, what does Positive do? Positive also is in the business of, you know, providing services and sellering ancillary products. And so they sold a registration with the American Kennel Club, which the plaintiff paid for, and that was mailed. And she received everything. But all of that occurred after the alleged economic injury of either paying too much, is the allegation, of paying a premium, or not even paying for it at all. That had all occurred. And as the cases we've cited in our brief, and the court is well aware, proximate cause is not only an element that must be proved in this case, but it is one that should be carefully looked at in a RICO case at the pleading stage. And there certainly is no proximate cause here. The other issue with respect to my client that I wanted to raise with the court has to do with the conducting the affairs of the enterprise requirement. That there needs to be an allegation, supported by facts, that my client directed the affairs of the enterprise. They don't need to be the, you know, proverbial mastermind, but they need to have some role in directing the affairs of the enterprise. There are zero allegations here with respect to Positive. In fact, the allegations in the complaint negate that theory. If we look, for example, at paragraphs 44 of the complaint, or 55 of the complaint, both of those expressly allege that my client is controlled and directed by Petlin Corporate. Now, you know, the truth of those allegations, be as they may, those are the allegations that are before the court, those are the ones that need to be assumed true, and those are the ones that show that my client could never have any civil RICO liability in this case whatsoever. That's in the Reeves case from the U.S. Supreme Court, and plaintiffs even concede in their reply brief that all of the defendants need to have some role in directing the affairs of the enterprise. So for the reasons stated by the district court, as well as discussed by my co-defendants counsel, and specifically for the reasons why my client, Positive, doesn't belong in the case, we respectfully request that your Honor's affirm. Thank you, Mr. Rogers. Ms. Elwely, you have reserved five minutes. Thank you. I just want to respond briefly to a few of the points made. So I have an issue that I didn't know I had before I walked in here, which is that you allege in your complaint that the members of the class had been injured in their property and that they have paid for unreliable certifications, etc. So it seems to me the damages here are the value of the puppy. And we just heard, although it's not in the complaint, that your client was offered the value of the puppy. So I'm just wondering about the good faith quality of this allegation. Mrs. Narrows, I can't speak to facts that are not in the complaint. Mrs. Narrows paid a premium for a pet that was dying. She wants to vindicate the RICO violations on behalf of herself and a class of some... But she has to have damage. Yes. She paid $2,400 for a puppy mill-bred animal that was dying that was marketed as healthy, vet-checked twice, free of parvovirus, and coming with accompanying services from the preferred veterinarian and positive. You know, what could be sort of more legitimate than a pet store that sells an animal and says, here's a health... You know, we've examined this puppy carefully. Here's... It's healthy. You know, you have that assurance. And if you don't feel good enough about that, we are also going to, you know, give you these services from the preferred veterinarian. But in fact, the preferred veterinarian and Pet Land Council knew that this health certificate was at best unreliable and at worst an outright fraud. And I just want to get back to Your Honor's question about, you know, what is Pet Land Inc.'s role in this? They do not have to select every veterinarian, see every health certificate to have essentially put this fraudulent scheme into motion. And the evidence that they have done that... But you allege this... I think, actually, one of your adversaries made a very good point, which is that you allege a top-down conspiracy when the facts, when you really look at them, suggest a bottom-up type conspiracy. You know, the fact remains, you're alleging that somehow Pet Land, the franchisor, corrupted this very large group of people, all the veterinarians, all the franchisees, and positive. Yet there are no facts that describe in any way how they went about doing that. There are conclusions about policies, but where are the facts? The facts... So if you view Dr. Goode's affidavit and, you know, counsel for Pet Land Council discussed, the affidavit is showing just the routine business transactions between a veterinarian and Pet Land Council. Exactly. That's what they were. But Dr. Goode quit that position because he was being instructed to lie about the health status of the animals, and he didn't want to do that by Pet Land Kenesaw, at the same time that Pet Land Kenesaw was becoming closer and closer with Pet Land Corporate and with other franchises. And he was told again and again that the store was going to follow Pet Land Corporate's protocols. So fast forward... He was told that by Pet Land Kenesaw. He was, yeah. He wanted to do things differently with regard to the treatment and sale of sick pets in the store, and they said, no, Pet Land Corporate sets our protocols. So if you fast forward 10 years, and the exact harm that Mrs. Narrows experienced was something that Dr. Goode testified about... Well, let me just stop you. Fast forward 10 years. Let's not exactly breeze past that. He left in 2005. Why is the information that he has provided to you that is dated a long time ago, how is this in any way relevant to this complaint today? Because essentially it shows that Pet Land was able to find a veterinarian who would do what he would not. So the veterinarian that... In 2005. Yes. So he left because he was being instructed to lie to customers about where their animals came from, how sick they were, the fact that they could, you know, be incubating diseases. Instructed to lie by Pet Land Kenesaw. Kenesaw, who was following Pet Land Corporate's protocols. And 10 years later, Mrs. Narrows is given a health certificate that says your puppy is healthy. This is a pet that has just come off a truck, you know, trucked from somewhere, that by all accounts was, you know, actively harboring parvo disease. And she was told that this pet is healthy, and she paid $2,400 for it. Now... And let me also go back to you said following the policies of Pet Land Corporate. How... What is different about that relationship that is different than any other franchise or franchisee relationship? Certainly Pet Land Kenesaw is a franchisee. And you kind of are waving your hand and saying following the direction of Pet Land Corporate. But other than the fact that there's a franchisee-franchisee relationship, and other than the fact that you have alleged they're following the policies, where are the specifics of this scheme? Respectfully, Your Honor, Pet Land Corporate does not need to act in a different way with regard to its franchises than other franchise businesses typically act. What Mrs. Narrows alleged was that it acts in concert with the veterinarians. It uses the sort of imprimatur of their, you know, respected profession to carry out this scheme. That is so different from cases like Ray or Almanza in which you have either parallel conduct or just an innocent, you know, service provider. That's not what's going on here. And so really to view what happened to Mrs. Narrows as sort of a fluke accident or a franchise going rogue is contrary to all the facts in the complaint that shows that Pet Land Kenesaw was just doing what Pet Land Corporate had instructed it to do. But if we buy into the theory that you're advancing today, aren't you indicting the entirety of the franchise or franchisee system that is so prevalent? Simply because you have that sort of a relationship and you point to corporate and just say they're following the policies, where's the meat to those allegations? Not at all, Your Honor. You know, RICO is a very fact-specific statute, and what shows an association, in fact, enterprise and the conducting of the enterprise affairs is going to be different in each situation. So the question is really, you know, why are these actors getting together? Why are the veterinarians, why is Pet Land using the veterinarians, and how is it working with them? And, you know, how did the plaintiff experience this fraud? So it's certainly not the case that in every franchise situation the franchisor is going to be on the hook for whatever the franchisee did. But, you know, in a case like the public storage case where, you know, you have a contract that's given to customers that makes a uniform representation here about the pets being healthy, that is a fair inference that the franchise used the cover of its legitimate business to carry out this fraud, which is, of course, you know, stopping that is one of the chief purposes of RICO, as the Supreme Court has said. So I see I'm past my time. Thank you. Thank you very much. Thank you, counsel. We'll take the case under advisement and move on to the third and last of the cases this morning. Angela Ruff v. Salas.